Counsel of Record
Gregory Bockin
Christopher Bruckmann
Pei Chung
Elizabeth Doisy
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
T: 202-551-5984

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | : |
| 100 F Street, N.E. | : |
| Washington, DC 20549 | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : |
| | : |
| **NANOTECH ENGINEERING, INC.,** | : |
| 2601 Main Street, Suite 370 | : |
| Irvine, CA 92614 | : |
| **MICHAEL JAMES SWEANEY (also known as Michael Hatton),** | :   Case No. |
| 2555 Main Street, Apt. 3050 | : |
| Irvine, CA 92614 | : |
| **DAVID SWEANEY,** | : |
| 2649 Bison Road | : |
| Fort Collins, CO 80525 | : |
| **and JEFFERY GANGE,** | : |
| 33 Elizabeth Lane | : |
| Irvine, CA 92602 | : |
| | : |
| **Defendants,** | : |
| | : |
| **and** | : |
| | : |
| **NANOTECH FINANCE LLC,** | : |
| 33 Elizabeth Lane | : |

Irvine, CA 92602                           :
**OMNI GOLF, LLC,**                        :
    33 Elizabeth Lane  :
    Irvine, CA 92602    :
**and 3 DRAGONS LLC,**                     :
    2649 Bison Road     :
    Fort Collins, CO 80525 :
                                       :
    **Relief Defendants.** :

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") alleges as follows:

### SUMMARY

1.    This is an emergency action seeking to, *inter alia*, freeze funds held by the Defendants and Relief Defendants so that the Defendants, who are presently perpetrating an ongoing securities fraud, cannot abscond with, transfer, convert, or further dissipate assets received from, and rightfully belonging to, more than one hundred investor-victims.

2.    As set forth below, convicted securities fraudster Michael James Sweaney ("Michael Sweaney") and the other Defendants are engaged in an ongoing fraudulent offering of the securities of Nanotech Engineering, Inc. ("Nanotech"). Over the last two years, the Defendants and others have solicited more than $9.4 million in investments from more than one hundred people through deceptive acts, including misrepresenting and omitting material facts in filings with the SEC and in private placement memoranda ("PPM(s)"). The Defendants' deceptive conduct has concealed from investors not only Michael Sweaney's prior criminal conviction,

but also the misappropriation of more than $2.4 million in investor funds by the Defendants – including the Defendants' purchases of a yacht, several sports cars, and cosmetic surgery.

3.      Starting on approximately September 15, 2017 and continuing through the present, Defendant Michael Sweaney, masquerading under the pseudonym "Michael Hatton," served as Chief Financial Officer of Nanotech, while his nephew, Defendant David Sweaney, served as Chief Executive Officer, and Defendant Jeffery Gange ("Gange") served as Chief Operations Officer. During this time, Nanotech employees were pressured to, and did, cold-call potential investors from Alaska to Florida, many of whom purchased Nanotech shares.

4.      Nanotech filed three separate Forms D with the SEC asserting that this offering of shares was exempt from the registration requirements of the Securities Act of 1933 ("Securities Act"). Those Forms D contained multiple misrepresentations and omissions of material facts, including: (a) the failure to disclose Michael Sweaney's role with the company and thereby omitting the fact that he had previously been convicted of felony securities fraud, (b) the false statements that Nanotech's executive officers, including the Defendants, would receive only $15 of investor funds when the Defendants had, in fact, directly and indirectly, received more than $900,000 by the time the most recent Form D was filed, and (c) misrepresentations regarding amount of investor money that would be used to pay commissions to Nanotech employees for convincing victims to invest.

5.      Nanotech, a Delaware Corporation with operations in Colorado and California, employed numerous "sales agents" (actually unlicensed stockbrokers being paid on a commission basis) in a "boiler-room"-type environment. These sales agents cold-called potential investors across the country. Investors were convinced to invest by dubious claims of a patent-pending invention that would change the world: the allegedly revolutionary "Nanopanel" solar panel. As stated in Nanotech's PPM:

> Solar panels need no longer be large, heavy, fragile, expensive to manufacture and install, with only 20% efficiency. Nanotech Engineering has invented what we believe to be the last generation Solar Panel, thin, lightweight, stronger than steel, yet flexible and three to four times more efficient . . . Also, our panels will allow the use of solar in parts of the world that would otherwise not use solar due to a lack of sunny weather. Even if a customer is only getting 40% efficiency in a non-sunny part of the world, that is still double that of traditional panels.

6.      Potential investors were provided with a PPM, and if they decided to invest, a subscription agreement, which outlined the terms of the investment.

7.      Nanotech's website, www.nanotechengineeringinc.com, has this PPM available for potential investors to download. The PPM on Nanotech's website also contains multiple material misrepresentations and omissions, including (a) falsely identifying Nanotech's CFO (Michael Sweaney) as "Michael Hatton," (b) misleading investors about the fact that investor money would be diverted to other entities in which the Defendants and/or other Nanotech employees had an interest, and (c) misleading investors about the fact that Michael Sweaney, David Sweaney, and Gange were misappropriating investor money from Nanotech for their personal use.

8.     As of December 4, 2019, Nanotech's website continues to operate and Nanotech continues to solicit additional investor funds.

9.     By knowingly or recklessly engaging in the conduct described in this Complaint, the Defendants violated, and unless enjoined will continue to violate, Section 17(a) of the Securities, and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

10.     Contemporaneously with the filing of this Complaint, the SEC seeks a temporary restraining order:

a.     freezing the assets held by the Defendants and Relief Defendants;

b.     requiring an accounting;

c.     preserving all existing documents related to this action;

d.     providing for expedited discovery, particularly with respect to the location of additional investor funds; and

e.     requiring the Defendants to show cause why the Court should not issue a Preliminary Injunction imposing the requested relief during the pendency of this action.

11.     Through this action, the SEC also seeks:

a.     entry of a permanent injunction prohibiting the Defendants from further violations of the federal securities laws;

b.     orders prohibiting the individual defendants from serving as officers or directors of a public company;

   c.  disgorgement of the Defendants' ill-gotten gains, together with prejudgment interest;

   d.  disgorgement from the Relief Defendants of all unjust enrichment and/or ill-gotten gains received from the Defendants, together with prejudgment interest; and

   e.  orders imposing civil penalties as to each Defendant.

## JURISDICTION AND VENUE

11. The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act, [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. §§ 78u(d)] to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

12. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

13. Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendant Nanotech filed with the SEC in this judicial district three materially false and misleading Forms D signed by Defendant Gange. Investor victims are located across the country, with addresses in at least 25 states, including Alaska, Washington State, Missouri, Maryland, Florida, and Texas.

14.     Additionally, certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein were effected, directly or indirectly, by making use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails.

DEFENDANTS

15.     **Nanotech Engineering, Inc. ("Nanotech")** is a Delaware corporation formed on August 14, 2017.  Nanotech maintains its principal place of business at 2601 Main Street, Suite 370, Irvine, California, and also has a facility located at 140 2nd St. SW, Loveland, Colorado. Neither Nanotech nor its securities have ever been registered with the SEC. Nanotech purports to be in the business of developing revolutionary solar panels. From August 14, 2017 to the present, Nanotech has had no discernable source of income or revenue – virtually all of its funds appear to be investor funds.

16.     **Michael James Sweaney, a.k.a Michael Hatton,** age 56, is a resident of Irvine, California.  Michael Sweaney, operating under the alias "Michael Hatton," serves as the Chief Financial Officer of Nanotech.  In February 1998, Michael Sweaney pleaded guilty to one count of felony securities fraud in Nevada state court, was ordered to pay restitution to ten investors, and was sentenced to a 12-to-32-month suspended prison sentence, suspended in favor of two years of probation.  Despite efforts to hide his true identity from Nanotech investors, Michael Sweaney has listed his legal name on multiple Nanotech bank forms.

During the fraud, as detailed below, Michael Sweaney diverted at least $550,000 in investor funds for his personal use.

17.     **David Sweaney**, age 40, is a resident of Fort Collins, Colorado. David Sweaney serves as the Chief Executive Officer of Nanotech and is Michael Sweeney's nephew. David Sweaney diverted at least $240,000 in investor funds for his personal use.

18.     **Jeffery Gange ("Gange")**, age 57, is a resident of Irvine, California. Gange serves as Nanotech's Chief Operations Officer. Gange signed each of the three materially false and misleading Forms D that Nanotech filed with the SEC. Gange diverted at least $160,000 in investor funds for his personal use.

RELIEF DEFENDANTS

19.     **Nanotech Finance LLC ("Nanotech Finance")** is a Delaware limited liability corporation, with its principal place of business in Irvine, California. Its single member and manager is Defendant Gange. Nanotech Finance received at least $650,000 in ill-gotten gains during the scheme.

20.     **Omni Golf, LLC ("Omni Golf")** is a California limited liability corporation, with its principal place of business in Irvine, California. Omni Golf's registered address is the same address as Nanotech's address in its May 17, 2018 and June 14, 2018 Forms D, and its sole registered member is Defendant Gange. Omni Golf received at least $400,000 in ill-gotten gains during the scheme.

21.     **3 Dragons LLC ("3 Dragons")** is a Colorado limited liability corporation, with its principal place of business in Avon, Colorado. 3 Dragons was

originally formed by a person who appears to be a relative of David Sweaney, and

David Sweaney is listed as an LLC member.  3 Dragons received at least $480,000

in ill-gotten gains via checks during the scheme.

### THE NANOTECH FRAUD

#### *Nanotech's Purported "Revolutionary" Business*

22.     Nanotech purports to be developing the "Nanopanel," an innovative

solar panel. As described on the Nanotech website, the Nanopanel is "a lightweight,

stronger than steel yet flexible Solar Panel that is more than three times more

efficient than traditional solar." Nanotech claims that its solar products "[s]urpass[]

any substance other than reactor-grade uranium regarding energy produced per

pound of material." In Nanotech's own words, its Nanopanels are nothing short of

revolutionary:

> Our Nano Solar Panels now give consumers a positive return on
> investment, making them the ideal choice, and demand for our panels
> shall be enormous and immediate.

> At Nanotech Engineering Inc. we are developing Solar Panels the size
> of a FedEx Envelope. By layering sheets of Graphene as a
> substructure, we put a Carbon Nanotube Forest over the top, with our
> proprietary mineral solution. As the Sun's rays hit the array, electrons
> are generated through the forest much faster than Silicon.

> Clearly in less than ideal weather this number drops, however the
> Panels are still more efficient than traditional solar panels in cloudy
> weather, remember photons still move through clouds, so that we will
> see panels in places previously unthinkable in the past.

> Our solar panels are combined using Graphene sheets into a single
> structure, from there a Graphene Forest is applied on the surface with
> our proprietary minerals, creating a lightweight panel that is stronger
> than steel yet has pushed the upper limits of the energy that can be
> received and used by the Sun. In short this is by far the most efficient

Solar Panel ever created. Every photon that hits graphene creates three electrons.

Our main market is replacing the old Solar Panels and applications for those that otherwise wouldn't use solar. We also are anticipating applications in parts of the world that have less than ideal weather, if our panel can for example only get 40% in New York, or 20% in Denmark, it will be used, achieving the dream of a solar world!

### *The Commencement of Nanotech's Fraudulent Securities Offering*

23.     Beginning in approximately September 2017, Nanotech began selling securities – shares of Nanotech – through a private placement memorandum. These securities were not registered with the SEC. The shares were priced at $2.80 per share, and the company stated that it planned to sell 24 million shares – a capital raise of $67.2 million – which, allegedly, represented 25% of the equity of Nanotech. Thus, the Defendants indicated that, if the capital raise was successful, Nanotech would have a valuation of approximately $268 million. The stated minimum investment amount was $28,000, though Nanotech sometimes accepted investments of smaller amounts.

24.     Broadly speaking, Section 5 of the Securities Act [15 U.S.C. § 77e] makes it unlawful to offer or sell a security in interstate commerce unless there is a registration statement in effect for the security, or unless certain exemptions apply.

25.     Regulation D [17 C.F.R. § 230.501, *et seq.*] provides for multiple exemptions to Section 5's registration requirement.

26.     The Defendants asserted that their offering of unregistered Nanotech securities was exempt from Section 5's registration requirement pursuant to Regulation D, Section 506(c) [17 C.F.R. § 230.506].

27.     If a company is offering and selling securities in reliance on certain

provisions of Regulation D, including Section 506(c), it is required to file a Form D

with the SEC within 15 days of the first sale of security, and Form D sets forth a

list of information that the Company is required to provide, including:.

- A list of related persons – defined to include: "Each executive officer and director of the issuer and person performing similar functions . . ." (Item 3);

- The name and address "for each person that has been paid or will be paid directly or indirectly any commission or other similar compensation in cash or other consideration in connection with the sales of securities in the offering . . ." (Item 12);

- The amount of sales commissions paid, or estimated to be paid (Item 15); and

- The "amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promotors in response to Item 3" (Item 16).

28.     17 C.F.R. § 239.500 requires, *inter alia*, that any entity that has filed a

Form D must amend that Form D, as soon as practicable, (a) to correct any material

mistake of fact, or (b) when there is increase of more than 10% in the amount of

commissions, finders' fees or use of proceeds for payments to executive officers, directors or promoters.

29.     The Nanotech shares that were offered and sold are securities under the federal securities law. Not only are equity shares sold for investment purposes a classic example of a security, but also Nanotech's private placement memorandum refers to the shares as a "Regulation 'D', 506C Covered Security." Additionally, each of the three Forms D that Nanotech filed with the SEC is entitled "Notice of Exempt Offering of Securities" and specifies the type of securities being offered as "Equity."

30.     Nanotech employs a team of "telephone sales agents" to cold-call potential investors. These "sales agents" have, at least at times, been paid on a commission basis, meaning that they are actually securities "brokers" within the meaning of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)], because receiving transaction-based commissions is one of the hallmarks of a broker.

31.     When sales agents call potential investors, they try to get them to view a web-share presentation and, ultimately, to invest. Potential investors are then provided with Nanotech's banking information so that they can transfer / wire funds to Nanotech. Potential investors are also provided with copies of a private placement memorandum, which allegedly provides information about Nanotech.

32.     In total, starting in September 2017 and continuing to at least October 22, 2019, Nanotech's bank records reflect that it has raised at least $9.4 million from investors. One investor alone appears to have sent $2,000,000 to Nanotech.

33.     Bank and shipping records indicate that Nanotech's investors live across the country in at least 25 states.

### Nanotech Filed Its First Misleading Form D in May 2018

34.     On May 17, 2018, more than seven months after Regulation D's 15-day deadline had passed, Nanotech filed its first Form D with the SEC regarding this offering. In that Form D, Nanotech proposed offering $30 million worth of equity shares and indicated that $1.2 million had already been sold to 41 investors.

35.     This May 2018 Form D had multiple misstatements and omissions of material facts that were never corrected by Nanotech.

36.     In Item 3, (Related Persons) of its May 2018 Form D, Nanotech listed only David Sweaney.

37.     In reality, multiple other persons served as Nanotech's executive officers, including, at least, Michael Sweaney and Gange.

38.     The failure to list Michael Sweaney and Gange was not only misleading, but materially so; it was part of a scheme to hide the role of convicted felon Michael Sweaney.

39.     In Item 12 (name and address of persons to be paid commission) of its May 2018 Form D Nanotech, again, listed only David Sweaney.

40.     In reality, Nanotech paid sales commissions to numerous other people.

41.     The failure to list other persons being paid sales commissions was not only misleading, but materially so as it concealed the boiler-room operation Nanotech ran to sell its shares.

42.      And again, in Item 16 (amount of proceeds to related persons) of its May 2018 Form D, Nanotech disclosed that David Sweaney would receive only $15. This was false and misleading for multiple reasons.

43.      First, in reality, by May 17, 2018 when Nanotech filed this Form D, David Sweaney had already received $129,500 of funds raised through this offering.

44.      Second, by May 17, 2018, 3 Dragons had already received $11,000 of funds raised through this offering, and David Sweaney is a one of the three members of 3 Dragons.

45.      Third, Item 16 not only requires the issuer to list proceeds that have been or are proposed to be given to people who are listed in Item 3, but to "any of the persons required to be named as executive officers, directors, or promoters in response to Item 3 above." Thus, Nanotech was required to (but did not) disclose the proceeds given to Michael Sweaney and Gange.

46.      By May 17, 2018, Michael Sweaney had received $82,500 in proceeds from this offering.  And, by May 17, 2018, Gange had received $11,375 in proceeds from this offering.

47.      Gange signed this Form D on behalf of Nanotech, which was electronically filed with the SEC in this judicial district.  The Form D was and is available to the public through the SEC's EDGAR system.

### Nanotech Filed Its Second Misleading Form D in June 2018

48.      On June 14, 2018, Nanotech filed a second, amended Form D, which was incorrectly marked as a new notice. In the June 2018 Form D, Nanotech

proposed to raise $67.2 million from selling equity shares, and indicated that $1.3 million had already been sold to 41 investors.

49.    This June 2018 Form D repeated the same material misrepresentations and omissions as the May 2018 Form D, although by then the Defendants had diverted to themselves far more investor money: David Sweaney had received $129,500, 3 Dragons had received $61,000, Michael Sweaney had received $97,500, and Gange had taken $14,375.

50.    Again, Gange signed the Form D on behalf of Nanotech and electronically filed it with the SEC.  This second, false Form D was and is available to the public through the SEC's EDGAR system.

### Nanotech Filed Its Third Misleading Form D in February 2019

51.    On February 11, 2019, Nanotech filed a third Form D, which was again incorrectly marked as a new notice, rather than as an amendment to the previous Form D. In the February 2019 Form D, Nanotech still proposed to raise $67.2 million by selling equity shares, but now falsely indicated that $3.6 million in securities had already been sold to 140 investors. An analysis of Nanotech's bank records shows that, in fact, more than $4.8 million had been raised from investors by that point.

52.    This February 2019 Form D also repeated the same material misrepresentations and omissions as Nanotech's prior two Forms D, although by then the Defendants had diverted to themselves even more investor money: David Sweaney had received $129,500, 3 Dragons had received $478,129, Michael

Sweaney had received $234,050, Gange had received $35,815, and Omni Golf had received $72,000.

53.     Additionally, in Item 15 (amount of commissions), Nanotech stated that the amount of commissions was or would be only $100. Notably, this was a decrease from the May and June 2018 Forms D, which indicated commission payments in excess of $100,000.

54.     In reality, by February 11, 2019, when Nanotech had filed its third Form D, Nanotech had already paid at least $103,012 in commissions.

55.     The amount of commissions Nanotech listed is not only false, but materially so, as any reasonable investor would want to know how much of their investment was going to pay commissions on sales of Nanotech securities instead of actually being invested in the company.

56.     As with the prior false Forms D, Gange signed the filing on behalf of Nanotech and electronically filed with the SEC.  Again, the Form D was and is available to the public through the SEC's EDGAR system.

### Nanotech Used a Misleading Private Placement Memorandum

57.     When issuers sell securities pursuant to one of the Regulation D exemptions, they often provide investors, and prospective investors, with a private placement memorandum, which contains key information about the issuer.

58.     Nanotech's website has their current PPM available for download by investors Nanotech sales agents have contacted.

59.     The PPM has multiple misstatements and omissions of material facts, including (a) falsely stating that the CFO's name was Michael Hatton, (b) falsely stating that investor money would be used only for overhead expenses and the manufacture of Nanopanels, when executives in fact used a significant portion of investor money to support their lavish lifestyle, and (c) failing to disclose that investor money was being transferred to other entities owned or controlled by Nanotech executives.

60.     Specifically, page 18 of the PPM identifies one of Nanotech's "[k]ey personnel" as "Michael Hatton, Chief Financial Officer."  Again, this was false; Nanotech's CFO was, in fact, Michael Sweaney.

61.     Misrepresenting the CFO's name in the PPM was part of a scheme to conceal Michael Sweaney's true identity and prior conviction for felony securities fraud. That the CFO of a company engaged in an unregistered offering of securities was previously convicted of felony securities fraud is a fact that any reasonable investor would want to know before deciding whether to invest.

62.     The PPM, at page 29, also states that: "Nanotech Engineering and its managers have no lawsuits pending, no legal actions pending, or judgments entered against Nanotech Engineering or its managers and, to the best knowledge of Nanotech Engineering, no legal actions are contemplated against Nanotech Engineering and its managers."

63.     In reality, however, Michael Sweaney has multiple civil judgments against him, including a $46,020 state tax judgment from 2008 that remains

17

outstanding, as well as, again, the judgment of conviction relating to his prior felony securities fraud.

64.    Importantly, the PPM also contains numerous representations about the use of investor funds, including:

   a.   "Nanotech Engineering will use the proceeds of this offering to complete our solar panel (the Nanopanel™), based on Nanotechnology, and bring the Nanopanel™ to market.

   b.   A chart listing that of the $67,200,000 to be raised in the offering, $11,088,000 will be used for "Operations/syndication cost" and the "Balance of capitol for Nanopanel™ production will be $56,112,000."

65.    The PPM does not disclose in any fashion that investor funds would be used by executives for personal expenses, but rather indicates that all funds would be used for "Operations/syndication cost" and Nanopanel production.

66.    A reasonable investor would want to know that the funds that Nanotech had promised would be used for corporate overhead and/or manufacture of the Nanopanel were, instead, being used by executives for personal purchases.

67.    Similarly, the PPM does not disclose in any fashion that investor funds would be transferred to executives.

68.    In truth and fact, however, a material percentage of all investor funds were transferred to Michael Sweaney, David Sweaney and Gange.

69.    A reasonable investor would want to know about these transfers.

70.     The PPM does not disclose in any fashion that investor funds would be transferred to entities in which executives had a beneficial interest.

71.     In truth and fact, a material percentage of all investor funds were transferred to entities in which Michael Sweaney, David Sweaney and Gange owned or controlled.

72.     The PPM contains only one disclosure about only one of the Relief Defendants, and even that disclosure is misleading:

> We have licensed our Graphene Golf Shafts to Omni Golf
> Inc., a new golf club manufacturer that will be breaking
> into the market with shafts that are more powerful, and
> whip back into place faster since the graphene corrects
> itself quicker than graphite or steel.

73.     Even assuming that Nanotech has, in fact, developed "Graphene Golf Shafts" and executed such a licensing agreement, this disclosure still fails to disclose that (a) Omni Golf is controlled by one of Nanotech's executives, Gange, (b) Omni Golf has not paid any money to Nanotech for this license, and (c) that, in fact, Nanotech sent money to Omni Golf, which is the opposite of the situation suggested by the disclosure.

74.     Again, a reasonable investor would want to know that their funds were transferred to entities owned and controlled by Nanotech's executives.

### THE DEFENDANTS' MISAPPROPRIATION OF INVESTOR FUNDS

75.     The charts and paragraphs 76-114 below identify spending and direct transfers of funds the SEC has traced to Defendants and Relief Defendants so far, though further investigation may reveal more.

76.    Nanotech has received little to no revenue during the course of the scheme, a fact which Nanotech confirmed in its Forms D when Nanotech indicated that it had "no revenues."

77.    An analysis of Nanotech's bank accounts corroborates Nanotech's statement in this regard. Nanotech's various bank accounts received a total of $10.6 million in incoming funds, but more than $1 million of that was simply transfers from one Nanotech account to another, resulting in a net of $9.6 million in incoming funds. Of that, at least $9.51 million are demonstrably investor funds. Thus, non-investor funds, if any, are limited to approximately $90,000, and more likely less than that (if any). Yet, as the chart below shows, the three individual Defendants have, either directly to themselves or through the Relief Defendants, diverted to themselves far in excess of that amount, at least $2,494,029.

| | |
|---|---|
| Funds misappropriated through the Defendants' non-business spending | At least $458,962.13 |
| Funds misappropriated through transfers to the individual Defendants | At least $498,791.77 |
| Funds misappropriated through transfers to the Relief Defendants | At least $1,536,275.11 |
| **TOTAL:** | **At least $2,494,029.01** |

78.    Because Nanotech has virtually no source of funds other than investors, the moneys diverted to the Defendants from Nanotech are entirely or almost entirely investor funds.

### *The Defendants Are Using Investor Funds to Pay for a Yacht and Other Personal Expenses*

79.     In total, Defendants Michael Sweaney, David Sweaney, and Gange have transferred hundreds of thousands of dollars of investor money to themselves, and used hundreds of thousands more for personal purchases.

**Michael Sweaney's misappropriation of funds**

80.     On May 14 and 21, 2019, Nanotech transferred a total of $208,500 to a yacht company in Dana Point, California.

81.     Records from the yacht company show that this $208,500 was for the purchase of a forty-six foot Sea Ray yacht named the "Bella Vita." The named purchaser of the yacht was "Michael Hatton," the alias used by Michael Sweaney.

82.     Nowhere in any of Nanotech's private placement memoranda or filings with the SEC has Nanotech indicated that its CFO would use investor funds to purchase a yacht.

83.     Michael Sweaney also received $301,550 in direct transfers of funds from Nanotech.

84.     The chart below shows the total spending and direct transfers of funds the SEC has traced directly to Michael Sweaney. The below figures do not include amounts diverted to Defendant Michael Sweaney through the Relief Defendants.

| Funds Transferred to or Used by Michael Sweaney (Hatton) | |
|---|---:|
| Direct Transfers | $301,550.00 |
| Yacht | $208,500.00 |
| Cosmetic/Dermatology | $39,549.17 |
| Dental | $3,440.00 |
| Other (Medical/Fitness/Fertility/Optometry) | $605.00 |
| TOTAL | $553,644.17 |

**David Sweaney's misappropriation of funds**

85.    Similarly, David Sweaney received $133,926.19 in direct transfers of funds from Nanotech.

86.    David Sweaney also used Nanotech funds for non-business expenses, including spending at least $18,643.50 on luxury fashion goods (*e.g.*, Gucci, Louis Vuitton, etc.).

87.    The chart below shows the total spending and direct transfers of funds the SEC has traced to Michael Sweaney. The below figures do not include amounts diverted to Defendant David Sweaney through the Relief Defendants.

| Funds Transferred to or Used by David Sweaney | |
|---|---:|
| Direct Transfers | $133,926.19 |
| Yacht Related Expenses | $6,166.90 |
| Cosmetic/Dermatology | $9,754.00 |
| Dental | $37,557.00 |
| Beauty/Spa | $1,218.10 |
| Other (Medical/Fitness/Fertility/Optometry) | $7,968.68 |
| Luxury Fashions | $18,643.50 |
| Jewelry | $25,391.26 |
| **TOTAL** | **$240,625.63** |

**Gange's misappropriation of funds**

88.    In October 2018 and February/March 2019 Gange spent over $100,000 in Nanotech funds to purchase two Maserati sport cars.

89.    Gange also received $63,315.58 in direct transfers from Nanotech.

**Additional Misappropriation of Funds**

90.    In addition to the amounts specified above, more than $100,000 of investor funds were spent by the Defendants on obviously non-business items such

as vaping products. At present, the SEC is not able to determine which individual spent these funds, but regardless, investor funds were misappropriated for the personal use of one or more of the principals of Nanotech. The chart below summarizes the additional spending identified to date:

| Other Company Misappropriations (Not Yet Attributed to a Specific Individual Defendant) | |
|---|---:|
| Yacht Related Expenses | $57,308.33 |
| Cosmetic/Dermatology | $24,870.00 |
| Vaping/Tobacco | $7,275.27 |
| Beauty/Spa | $10,406.00 |
| Other (Medical/Fitness/Fertility/Optometry) | $2,682.00 |
| Cash withdrawals | $66,838.98 |
| TOTAL | **$169,380.58** |

### *The Defendants Are Improperly Transferring Investor Funds to the Relief Defendants, Which They Own and Control.*

91.     Nanotech transferred a total of at least $1,536,275 to entities in which the Defendants had a beneficial interest.

**Transfers to Nanotech Finance**

92.     Nanotech transferred a total of at least $650,000 to Nanotech Finance via checks, as summarized in the chart below.

| Payments to Nanotech Finance | | | | |
|---|---|---|---|---:|
| Bank and partial account # | | Date | Type of payment | Amount |
| 1st Bank | 6364 | 3/28/2019 | COUNTER CHECK | $110,000.00 |
| 1st Bank | 6364 | 4/29/2019 | Check Paid | $92,474.00 |
| 1st Bank | 6364 | 5/7/2019 | Check Paid | $17,950.00 |
| 1st Bank | 6364 | 6/13/2019 | Check Paid | $150,000.00 |
| 1st Bank | 6364 | 7/3/2019 | Check Paid | $128,000.00 |
| 1st Bank | 6364 | 7/31/2019 | Check Paid | $1,112.00 |
| 1st Bank | 6364 | 8/16/2019 | Check Paid | $127,525.00 |
| 1st Bank | 6364 | 10/15/2019 | Check Paid | $25,000.00 |
| | | | TOTAL | **$652,061.00** |

93.     Nanotech Finance only received $300 in incoming funds from sources other than Nanotech.

94.     Nanotech Finance is owned and controlled by Gange.

95.     Nanotech Finance's most recent bank records reflect that is a single member LLC, and that the sole signer on the account is Gange. Gange also signed documents submitted to the bank that identified Gange as the "Secretary / Member / Manager" of Nanotech Finance.

96.     Nanotech Finance's bank records indicate that after Nanotech Finance received investor funds from Nanotech, $5,000 was transferred to Michael Sweaney, $10,500 was transferred to Gange, and $12,000 was withdrawn as cash.

97.     Additionally, a $457,394.75 check issued from a Nanotech Finance account on July 23, 2019 remains outstanding and uncashed. Its whereabouts are not known to the SEC.

**Transfers to Omni Golf**

98.     Nanotech transferred total of at least $400,000 to Omni Golf via checks as shown by the chart below.

| Payments to Omni Golf | | | | |
|---|---|---|---|---|
| Bank and partial account # | | Date | Type | Amount |
| 1st Bank | 8930 | 9/24/2018 | Check Paid | $15,000.00 |
| 1st Bank | 8930 | 9/25/2018 | Check Paid | $1,000.00 |
| 1st Bank | 8930 | 11/16/2018 | Check Paid | $20,000.00 |
| 1st Bank | 8930 | 12/17/2018 | Check Paid | $30,000.00 |
| 1st Bank | 8930 | 1/30/2019 | Check Paid | $6,000.00 |
| 1st Bank | 8930 | 2/22/2019 | Check Paid | $23,000.00 |
| 1st Bank | 6364 | 3/20/2019 | Check Paid | $25,000.00 |
| 1st Bank | 6364 | 3/21/2019 | Check Paid | $25,000.00 |
| 1st Bank | 6364 | 3/22/2019 | Check Paid | $25,000.00 |

| Payments to Omni Golf | | | | |
|---|---|---|---|---|
| Bank and partial account # | | Date | Type | Amount |
| 1st Bank | 6364 | 4/18/2019 | Check Paid | $40,000.00 |
| 1st Bank | 6364 | 5/13/2019 | Check Paid | $25,000.00 |
| 1st Bank | 6364 | 5/24/2019 | Check Paid | $25,000.00 |
| 1st Bank | 6364 | 6/4/2019 | Check Paid | $20,000.00 |
| 1st Bank | 6364 | 6/14/2019 | Check Paid | $20,000.00 |
| 1st Bank | 6364 | 6/25/2019 | Check Paid | $20,000.00 |
| 1st Bank | 6364 | 7/11/2019 | Check Paid | $20,000.00 |
| 1st Bank | 6364 | 7/31/2019 | Check Paid | $17,882.00 |
| 1st Bank | 6364 | 8/15/2019 | Check Paid | $12,860.00 |
| 1st Bank | 6364 | 8/26/2019 | Check Paid | $14,951.00 |
| 1st Bank | 6364 | 9/26/2019 | Check Paid | $15,870.00 |
| | | | Total | $401,563.00 |

99.    Omni Golf only received $89,216 from sources other than Nanotech.

100.    Omni Golf is controlled by Gange.

101.    A Statement of Information for Omni Golf filed with the California Secretary of State on February 28, 2018 lists Gange as the sole member/manager of Omni Golf. Gange signed this Statement of Information.

102.    An Articles of Organization for Omni Golf filed with the California Secretary of State on February 6, 2018 was also signed by Gange as the "Organizer" of Omni Golf.

103.    In connection with opening a bank account for Omni Golf on September 21, 2018, Gange signed multiple documents on behalf of Omni Golf, including a certification that he was the CEO of Omni Golf and authorized to act on behalf of Omni Golf.

104.    Once funds were transferred from Nanotech to Omni Golf, at least $18,000 was transferred to Gange, and other funds were used to purchase at least

$112,000 in golf equipment, and at least $146,000 was used for "payroll" to unknown persons.

**Transfers to 3 Dragons**

105.    Nanotech transferred $480,000 to 3 Dragons via checks and one cash transfer, as shown by the chart below.

| Payments to 3 Dragons LLC | | | | |
|---|---|---|---|---|
| **Bank and Partial Account #** | | **Date** | **Type** | **Amount** |
| 1st Bank | 8930 | 4/27/2018 | Check Paid | $11,000.00 |
| 1st Bank | 8930 | 5/23/2018 | Check Paid | $50,000.00 |
| 1st Bank | 8930 | 7/6/2018 | Check Paid | $2,500.00 |
| 1st Bank | 8930 | 7/25/2018 | Check Paid | $3,729.00 |
| 1st Bank | 8930 | 8/7/2018 | Check Paid | $2,500.00 |
| 1st Bank | 8930 | 8/13/2018 | Check Paid | $30,000.00 |
| 1st Bank | 8930 | 8/31/2018 | Check Paid | $2,500.00 |
| 1st Bank | 8930 | 8/31/2018 | Check Paid | $7,500.00 |
| 1st Bank | 8930 | 8/31/2018 | Check Paid | $7,500.00 |
| 1st Bank | 8930 | 9/6/2018 | Cash Withdrawal | $3,800.00 |
| 1st Bank | 8930 | 9/21/2018 | Check Paid | $49,600.00 |
| 1st Bank | 8930 | 10/1/2018 | Check Paid | $2,500.00 |
| 1st Bank | 8930 | 10/26/2018 | Check Paid | $305,000.00 |
| 1st Bank | 8930 | 2/26/2019 | Check Paid | $3,218.69 |
| 1st Bank | 6364 | 5/28/2019 | Check Paid | $1,303.42 |
| | | | **Total** | **$482,651.11** |

106.    3 Dragons is controlled by David Sweaney and two other individuals.

107.    3 Dragons only received $264,687 from sources other than Nanotech.

108.    3 Dragons' Articles of Organization were filed with the Colorado Secretary of State on September 18, 2015. The documents list a woman with the last name "Sweaney" as 3 Dragons' Organizer, and lists two additional 3 Dragons' members, including David Sweaney. David Sweaney is listed as having the same home address as the Organizer.

109.   Documents from 3 Dragons' bank account list David Sweaney as the sole signatory on the account.

110.   Once funds were transferred from Nanotech to 3 Dragons, funds were then transferred back to David Sweaney ($32,410) and Michael Sweaney ($189,904), plus additional transfers to other persons with the last name Sweaney.

### *The Fraud Is Ongoing*

111.   Nanotech continues to solicit and receive investor funds, including the recent transactions listed below (all of which are in addition to the amounts described above):

- An October 28, 2019 incoming wire for $112,000 (equal to the purchase price of 40,000 shares);

- A November 15, 2019 check for $28,000 deposited (with the notation "10,000 shares");

- A November 15, 2019 deposit for $28,000 (equal to the purchase price of 10,000 shares); and

- A November 22, 2019 incoming wire for $27,980 (potentially for the purchase of 10,000 shares minus a wire transaction fee).

112.   The Defendants also continue to divert funds, including the recent transactions listed below (all of which are in addition to the amounts described above):

- Spending $3,160 on dermatology on October 25, 2019;

- Wiring over $15,000 to two entities with the same address as David Sweaney on November 6, 2019; and

- Spending $6,849.38 at Ferrari and Maserati of Newport Beach on November 14, 2019.

113.    During the course of the scheme, the Defendants and Relief Defendants have engaged in a practice of opening and closing different bank accounts. If the emergency relief sought in this Complaint is not granted, investor funds may be dissipated or transferred to unknown accounts, and investors may not be able to recover their investments from the Defendants.

114.    For example, the cashier's check for $457,394.75 of investor money improperly transferred to Nanotech Finance remains outstanding and uncashed. Its whereabouts are presently unknown.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 17(a) of the Securities Act
### (All Defendants)

115.    The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 114, inclusive, as if they were fully set forth herein.

116.    By engaging in the conduct that is described above, the Defendants knowingly, recklessly, or negligently in connection with the offer or sale of securities, by the use of the means or instruments of transportation, or communication in interstate commerce or by use of the mails, directly or indirectly:

    c.  employed devices, schemes, or artifices to defraud;

28

    d.  obtained money or property by means of untrue statements of material

facts, or omissions to state material facts necessary in order to make

the statements made, in light of the circumstances under which they

were made, not misleading; and/or

    e.  engaged in transactions, practices, or courses of business which

operated or would operate as a fraud or deceit upon the purchaser.

117.    By engaging in the foregoing conduct, the Defendants violated, and

unless enjoined will continue to violate, Securities Act Section 17(a) [15 U.S.C. §

77q(a)].

## COUNT II
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (All Defendants)

118.    The SEC realleges and incorporates by reference each allegation in

paragraphs 1 through 114, inclusive, as if they were fully set forth herein.

119.    By engaging in the conduct described above, the Defendant knowingly

or recklessly, in connection with the purchase or sale of securities, directly or

indirectly, by use the means or instrumentalities of interstate commerce, or the

mails, or the facilities of a national securities exchange:

    (a)    employed devices, schemes or artifices to defraud; and

    (b)    made untrue statements of material facts or omitted to state

material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not

misleading; and/or

29

(c)      engaged in acts, practices, or courses of business which operated

or would operate as a fraud or deceit upon any person in

connection with the purchase or sale of any security.

120.    By engaging in the foregoing conduct the Defendant violated, and

unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## COUNT III
## Aiding and Abetting Violations of Section 17(a) of the Securities Act
## (Defendants Michael James Sweaney, David Sweaney and Jeffery Gange)

121.    The SEC realleges and incorporates by reference each allegation in

paragraphs 1 through 114, inclusive, as if they were fully set forth herein.

122.    As alleged above, Defendant Nanotech and others violated Section

17(a) of the Exchange Act [15 U.S.C. § 77q(a)].

123.    Through their deceptive conduct, misstatements, misappropriation of

funds and other means alleged above, Defendants Michael Sweaney, David

Sweaney and Gange knowingly provided substantial assistance to, and thereby

aided and abetted, Defendant Nanotech's violations of the securities laws.

124.    By engaging the in the foregoing conduct, pursuant to Securities Act

Section 15(b) [15 U.S.C. § 77o(b)], Defendants Michael Sweaney, David Sweaney

and Gange violated, and unless enjoined will continue to violate violated Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)].

<u>Count IV</u>

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Defendants Michael James Sweaney, David Sweaney and Jeffery Gange)**

125.    The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 114, inclusive, as if they were fully set forth herein.

126.    As alleged above, Defendant Nanotech and others violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

127.    Through their deceptive conduct, misstatements, misappropriation of funds and other means alleged above, Defendants Michael Sweaney, David Sweaney and Gange knowingly provided substantial assistance to, and thereby aided and abetted, Defendant Nanotech's violations of the securities laws.

128.    By engaging the in the foregoing conduct, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t], Defendants Michael Sweaney, David Sweaney and Gange violated, and unless enjoined will continue to violate violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

<u>Count V</u>

**Unjust Enrichment Liability**

**(Relief Defendants)**

129.    The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 114, inclusive, as if they were fully set forth herein.

130.   Relief Defendants Nanotech Finance, Omni Golf, and 3 Dragons have obtained funds as part, and in furtherance, of the securities law violations alleged above, and under circumstances in which it is not just, equitable, or conscionable for these entities to retain the funds. As a result, these Relief Defendants have been unjustly enriched.

PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter an emergency, temporary, and preliminary order against the Defendants:

i.   temporarily freezing the Defendants' and Relief Defendants' assets;

ii.   ordering the Defendants and Relief Defendants to show cause why a preliminary injunction freezing such assets should not be entered;

iii.   requiring the Defendants and Relief Defendants to provide a verified accounting identifying:

    a.   the location and disposition of all funds received from investors;

    b.   the location and disposition of all accounts controlled by the Defendants or held for their benefit; and

    c.   the location and value of all investor assets, as well as personal or other assets currently held by the Defendants, or under their control or over which they may exercise actual or apparent authority.

iv.   prohibiting the Defendants from destroying, altering, or concealing records of any kind; and

v.   ordering expedited discovery.

Further, the SEC respectfully requests that the Court enter a final judgment:

## I.

Permanently restraining and enjoining all Defendants from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering all Defendants and all Relief Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

## III.

Enter an order requiring the Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## IV.

Enter an Order barring Michael Sweaney, David Sweaney, and Jeffery Gange from serving as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

## VI.

Retaining jurisdiction of this action for purposes of enforcing any final judgments and orders.


### JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Respectfully submitted,

Gregory Bockin (D.C. Bar No. 450885)
Christopher Bruckmann (D.C. Bar No. 491136)
Pei Chung (Local Rule 83.2(e) certification pending)
Elizabeth Doisy
U.S. SECURITIES AND
EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549
(202) 551-5684 (Bockin)
(202) 772-9292 (facsimile)
BockinG@SEC.gov

*Counsel for Plaintiff*
*U.S. Securities and Exchange Commission*

Dated: December 5, 2019